**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| AEIRAMIQUE GLASS<br>5105 Edmondson Avenue<br>Baltimore, MD 21229<br><br>Plaintiff | * * * * | |
| v. | * | Case No. 1:25-cv-02954-SAG |
| MAYOR AND CITY COUNCIL OF BALTIMORE<br>7 E. Redwood Street, 9th Floor<br>Baltimore, MD 21202<br><br>MAYOR BRANDON SCOTT,<br>in his official and individual capacities,<br>City Hall, 100 N. Holliday Street, Suite 250<br>Baltimore, MD 21202<br><br>and<br><br>DANA MOORE,<br>in her official and individual capacities,<br>7 E. Redwood Street<br>Baltimore, MD 21202<br><br>Defendants | * * * * * * * * * | |

*****************************************************************************

**AMENDED**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1. Plaintiff Aeiramique Glass brings this civil action to seek redress for unlawful employment practices and violations of her fundamental rights. This case arises from Defendants' pattern of employment discrimination, retaliation, and political reprisal carried out against Plaintiff in her capacity as an employee of the City of Baltimore. The claims asserted herein arise under federal and state law, including but not limited to the Americans with Disabilities Act of 1990, 42 U.S.C. § 1983, and Maryland's common law, constitutional, and statutory protections for citizens and workers.

2. Plaintiff is a cancer survivor and a dedicated public servant who, in reliance on Defendants' representations and promises of permanent appointment as Chief of Police Accountability, relocated from San Diego, California to Baltimore, Maryland in November

2023. In this role, Plaintiff uncovered and reported significant misconduct and violations of law within Baltimore City government. An independent investigation substantiated her disclosures and confirmed her integrity, yet rather than being restored to her rightful position, Plaintiff was met with escalating retaliation, culminating in her unlawful terminations on January 31, 2024 and again on June 28, 2024.

3. By their actions, Defendants engaged in conduct that was discriminatory, retaliatory, and unconstitutional. Specifically, Defendants' conduct: (a) violated the Americans with Disabilities Act, Rehabilitation Act, and Maryland's Fair Employment Practices Act by discriminating against Plaintiff on the basis of her status as a cancer survivor and retaliating after she disclosed her medical condition; (b) violated 42 U.S.C. § 1983 by depriving Plaintiff of rights secured by the First and Fourteenth Amendments, including freedom of speech and assembly; and (c) violated Maryland's common, constitutional, and statutory laws in multiple ways.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because some of Plaintiff's claims arise under the Constitution and laws of the United States, including the Americans with Disabilities Act of 1990 and 42 U.S.C. § 1983. Jurisdiction also lies under 28 U.S.C. § 1343(a)(3) and (4), which provide original jurisdiction over actions to redress the deprivation of constitutional and federal statutory rights under color of state law.

5. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants reside or conduct business in this District and all or a substantial part of the events or omissions giving rise to the claims occurred in Baltimore, Maryland, within the District of Maryland.

7. Plaintiff has fully and timely exhausted her administrative remedies as required by law. On April 23, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, assigned Charge No. 531-2025-03265. In her Charge, among other things, Plaintiff asserted she was "hired … in Nov. 2023 …. During negotiations, I was told Baltimore doesn't offer relocation assistance, but after relocating from San Diego, I learned this was false and reported it. In Jan. 2024, I was abruptly terminated after reporting legal and ethical violations. An investigation substantiated my claims, and the leadership involved was removed. I was retroactively reinstated with back pay but not returned to my role. Despite the hostile leadership being gone, I remained on administrative leave. I was strung along with vague transfer promises until after the mayoral [primary] election, then terminated again on June 28, 2024. I believe I was retaliated against for whistleblowing, faced political retaliation, and experienced discrimination as a cancer survivor due to delays in access to medical coverage and care." On June 9, 2025, following

its presumed service of the Charge upon the City in accordance with 29 CFR § 1601.14, the EEOC issued a Dismissal and Notice of Right to Sue, granting Plaintiff the right to pursue her claims in court. This action was initially filed within ninety (90) days of Plaintiff's receipt of that Notice, and is therefore timely under applicable federal statutes.

8. To the extent necessary, the parameters of the Local Government Tort Claims Act ("LGTCA") have been satisfied by Plaintiff due to the fact that Defendants were on actual or constructive notice of Plaintiff's tort claims within one year of their accrual. Notice was provided by the aforementioned Charge of Discrimination[1] as well as numerous instances of correspondence from Plaintiff directly to Baltimore City officials addressing all of the facts and circumstances giving rise to her claims herein. To the extent notice was lacking in any way, the City's defense of Plaintiff's tort claims has not been prejudiced by same.

**PARTIES**

9. Plaintiff Aeiramique Glass is an adult former resident of Baltimore, Maryland who presently resides in Wisconsin. At all times relevant to this action, Plaintiff served as Deputy Chief and subsequently Acting Chief of Police Accountability for the City of Baltimore, and was promised permanent appointment as Chief following a probationary period. Plaintiff is a cancer survivor and is therefore a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, the Rehabilitation Act, and Maryland's Fair Employment Practices Act. Throughout her employment by the City, from November 2023 through June 2024, Plaintiff performed her duties to the best of her abilities and in a manner that would meet or exceed the legitimate expectations of a reasonable employer. This dynamic is perhaps best demonstrated by the number of colleagues and Board members who expressed a want and need for Plaintiff to continue her good work following her initial firing by Defendants on January 31, 2024 and limited reinstatement thereafter. *See infra* ¶¶ 23, 27, 29, 33.

10. Defendant Mayor and City Council of Baltimore[2] ("the City") is a municipal corporation organized under the laws of the State of Maryland (and the Charter of Baltimore City) which may sue or be sued. The City was Plaintiff's employer within the meaning of the ADA, and at all relevant times exercised authority over Plaintiff's employment, benefits,

---

[1] It is well-settled that a Charge provides notice in satisfaction of the LGTCA, or renders it inapplicable. *See, e.g., Carter v. Harrison*, Civ. A. No. JRR-21-02724, 2022 WL 1556095, at *1-*2 (D. Md. May 17, 2022); *Hine v. Prince George's Cnty., Md.*, Civ. A. No. TDC-20-2929, 2021 WL 5882615, at *3-*4 (D. Md. Dec. 9, 2021).

[2] Defendants have already informed the Court that they have no objection to identifying this Defendant using this name, even in the absence of a formal amendment to Plaintiff's original Complaint. *See* Def.s' Jan. 28, 2026 Mot. to Dismiss at 1 n.1. Moreover, amongst the Defendants named in the original Complaint were the "Mayor, in his official … capacit[y]," the "Baltimore City Council," and the "City of Baltimore." *See* Pl.'s Sept. 8, 2025 Compl. at 1. Thus, for all intent and purposes, Plaintiff previously identified the "Mayor" and "City Council" of "Baltimore" as Defendants such that the entity was already a party to the case, albeit broken down into three names. Finally, and most importantly, in its Memorandum Opinion, the Court expressly instructed Plaintiff to "properly identify" the Mayor and City Council of Baltimore in "any proposed amended complaint[.]" *Glass v. City of Balt.*, Civ. A. No. SAG-25-02954, 2026 WL 1501104, at *6 (D. Md. May 29, 2026).

and termination. Finally, at all relevant times, the City received federal financial assistance within the meaning of 29 U.S.C. § 794 such that the Rehabilitation Act applies to it. By way of example and not limitation, the City received, and continues to receive, such funding in relation to the housing of its residents.

11. Defendant Brandon Scott, the duly elected Mayor of Baltimore, is sued in his official and individual capacities. As chief executive of the City, Mayor Scott exercised final policymaking authority with respect to personnel decisions, and at all relevant times acted under color of state law within the meaning of 42 U.S.C. § 1983. In this regard, given that, under the Baltimore City Charter, the Mayor had the power to remove at his pleasure all department heads, such as Defendant Moore and the Director of the HR Department, Quinton Herbert, each of whom informed Plaintiff that she had been terminated, once on January 31, 2024 (by Defendant Moore) and once again on June 28, 2024 (by Mr. Herbert), the Mayor had the power to direct those department heads to terminate an employee like Plaintiff. As such, as a functional matter, the Mayor had unconstrained authority to terminate Plaintiff.

## FACTS MATERIAL TO THE VARIOUS COUNTS

12. **November into Early December 2023 – Recruitment and Appointment**. Plaintiff was recruited and hired in early November 2023 by the City of Baltimore as Deputy Chief of Police Accountability Division. Within days of Plaintiff's first day on the job on or about November 30, 2023, the then-sitting Chief, Mariel Shutinya, resigned, effective December 15, 2023, and Plaintiff immediately thereafter assumed the duties of Acting Chief of Police Accountability. At or around the time of her appointment, Plaintiff was expressly assured by City leadership, including Ms. Shutinya as well as the Chief of Staff of the Office of Equity & Civil Rights ("OECR") Khadeja Farahmand, and OECR Deputy Director Caylin Young, that, upon successful completion of her six-month probationary period, she would be permanently appointed as Chief of Police Accountability.[3] In reliance on these material representations, Plaintiff uprooted her life and relocated across the country from San Diego, California to Baltimore, Maryland, incurring significant personal and financial costs. Plaintiff was also advised in this timeframe by Ms. Farahmand, in response to Plaintiff's query about her desire and need for relocation financial assistance, that such assistance was not available from the City. Mr. Young, however, subsequently informed Plaintiff that this was not accurate. Yet, no such assistance was ever offered or provided to Plaintiff thereafter despite Plaintiff requesting a meeting with Defendant Moore for her to discuss this subject.

13. The Deputy Chief and (acting) Chief positions Plaintiff held were designed as apolitical jobs focused on managing the staff assigned to the Deputy Chief / Chief and assisting the three boards, namely, the Police Accountability Bord ("PAB"), the Administrative Charge Committee ("ACC"), and the Civilian Review Board ("CRB") that were addressing police

[3] In this regard, it bears noting that, by the time Plaintiff was terminated, for the second time, on or about June 28, 2024 (as will be detailed hereinbelow), this six-month time span had already run.

accountability, along with the aforementioned staff, primarily by helping to generate an annual report and by putting together so-called "trial boards" presided over by administrative judges for situations where the above-referenced boards brought charges against police for alleged misconduct. Plaintiff also had some responsibilities in relation to community engagement and stakeholder buy-in. She did all of these things, which were her official duties, but she also chose to speak out about certain matters that, while perhaps related on some level to her official duties, were nonetheless peripheral to those duties. *See, e.g., infra* ¶¶ 17-19, 31. Indeed, some of her comments were contrary to positions taken by the City of Baltimore, i.e., her employer, but still needed to be expressed by Plaintiff given the high-level of would-be publicly-concerning dynamics she witnessed.

14. Taking a step back to the time before Plaintiff's employment with the City, the PAB (and the associated ACC) had first come into existence in Baltimore City in the summer of 2022. While Mayor Scott did sign the PAB into law, his administration was critical of the bill before its signing saying that, "[r]ather than enable the city to lead transformation efforts, [it] maintains the status quo." *See* "What will civilian oversight of police look like in Baltimore? Legislation ams to fund panel, keep its investigatory powers," Baltimore Sun (Mar. 11, 2022). The original proposal for the PAB would have allowed the Mayor to appoint all board members, whereas the finalized version only gave him the ability to directly appoint two members. *See* "New police accountability board to increase civilian oversight in latest push for reform in Baltimore," Baltimore Sun (June 28, 2022). The first meeting of the Board thereafter occurred in or about February of 2023, approximately 10 months before Plaintiff hiring.

15. As accurately described in an article by the Baltimore Sun, the

> city's Police Accountability Board … [is] one of many across the state formed following the Maryland General Assembly's passage of 2021's Police Accountability Act. The boards field misconduct complaints from residents, meet with the heads of law enforcement and issue annual reports. They are part of a framework of civilian oversight that also includes an Administrative Charging Committee tasked with reviewing police misconduct files and, potentially, reaching new conclusions.

"Baltimore's Police Accountability Board questions promotion of BPD captain despite pending complaint: 'Really, really serious matter,'" Baltimore Sun (Jan. 9, 2024).

16. According to an article published in the Baltimore Sun on November 3, 2023, immediately prior to the start of Plaintiff's employment:

> The new Police Accountability Board and [associated] Administrative Charging Committee fall under the city's Office of Equity and Civil Rights, which received a little more than $2.1 million earmarked for the boards in the budget for the 2023-2024 fiscal year that began on July 1. The mayor's budget anticipated 17 positions in city government to support the two boards' operations.

> [PAB Chair Joshua] Harris noted at Thursday's news conference that the Police Accountability Board does not have purview over that money.
>
> The Office of Equity and Civil Rights said 90% of the $2.1 million goes toward salaries, stipends and personnel costs, adding, "This allows the office to support the work of the city's police accountability/civilian oversight apparatus."

"Baltimore's new police oversight system launches, reviewing 395 internal cases in less than 5 months," Baltimore Sun (Nov. 3, 2023). Significantly, under the Baltimore City Code, PAB members (and ACC members) can only be terminated for cause. *See* Balt. City Code, Art. 1, §§ 11-1, et seq. It was at this time, just after this article and the events it recounted, that Plaintiff first began working for the City.

17. **Independent Counsel Issue**. During her tenure, Plaintiff advocated for and recommended, with the support of the United States Department of Justice, that the PAB and ACC be assigned independent legal counsel to ensure impartiality and compliance with best practices for police accountability. Plaintiff discussed this issue with persons both inside and outside Baltimore City government, including the aforementioned U.S. Department of Justice, who was involved in implementing a consent decree (which partially remains in effect to this day) that had been issued in or about 2017 by this Honorable Court following a 2016 U.S. Justice Department investigation as well as with members of the ACC, members of the PAB, the NAACP (with which PAB Chair Joshua Harris was affiliated), the ACLU (with which a CRB board member was affiliated), the City's HR department, and Defendant Dana Moore and Caylin Young, who were the Director and Deputy Director of the OECR, respectively, at that time. These communications occurred before Plaintiff's first termination on January 31, 2024 as well as thereafter. Defendant Dana Moore categorically refused this notion, stating "never." Defendant Moore also expressed her displeasure that Plaintiff had communicated about this issue with the U.S. Department of Justice, which she (Moore) believed should have no say in the matter. Defendant Moore's refusal directly undermined the independence and integrity of the accountability process, placed Plaintiff at odds with OECR leadership, and marked the beginning of a retaliatory campaign against Plaintiff.

18. **Integrity Bureau Pressure**. Plaintiff was approached by the Deputy Commissioner of Internal Affairs and pressured to instruct the ACC to retract disciplinary charges against high-ranking police officers. Needless to say, such requested actions would be far outside Plaintiff's official duties, as, by extension, would Plaintiff's subsequent communications with others regarding same, as recounted hereinbelow. After independently reviewing the case files, Plaintiff refused to participate in this misconduct and affirmatively supported the ACC's decision to maintain the charges. Plaintiff engaged in communications about this issue with the full ACC, various members of the PAB, and Ms. Moore before her first termination on January 31, 2024, and also with a representative of the City's HR department following said termination. Plaintiff's refusal to compromise the integrity of

the disciplinary process placed her in direct opposition to senior City officials determined to shield favored officers from accountability.

19. **Staffing and Budget Diversion**. Plaintiff uncovered significant irregularities in staffing and budgeting within the Police Accountability Division ("PAD"). Although the PAD was budgeted for 17 staff positions, only approximately five were actually dedicated to the Division. The remaining PAB-funded lines were improperly diverted to other uses. While Plaintiff, as noted previously, managed this staff, *see supra* ¶ 13, it was not within her official duties to question and challenge the apparent misuse of taxpayer funds by diverting such funds away from their earmarked would-be use. Plaintiff engaged in communications concerning this issue, both before and after her first termination, with all of the persons referenced previously concerning the independent counsel issue. *See supra* ¶ 17. Additionally, in relation to this issue, Plaintiff informed the City's HR department and the Mayor's office that she'd been contacted by the media. Plaintiff having raised these concerns, which implicated misuse of public taxpayer funds and mismanagement, further antagonized OECR leadership and the Mayor's office.

20. In December 2023 and/or January 2024, Plaintiff inquired with Defendant Moore about the need for an increase in pay for the Acting Deputy Chief of the PAD, Megan Mishou, but Defendant Moore would not substantively address these inquiries. She also inquired about the payment of comp time for staff, including Brandon Wafford, but Defendant Moore was not receptive to properly compensating these workers. One such inquiry, about Mr. Wafford, was actually made by Plaintiff earlier on the very day she was initially fired, January 31, 2024.

21. **January 2024**. Following her disclosures and assertions within and outside the Baltimore City government, some of which are recounted above, *see supra* ¶¶ 17-19, Plaintiff was subjected to a pattern of targeted retaliation and gaslighting by OECR leadership, including: (a) the "send the report now" incident, during which staff witnessed attempts to mischaracterize her work product; (b) an IT access block that denied Plaintiff access to essential systems; (c) repeated denials of compensatory time and overtime for her staff, for which she advocated in communicating with Ms. Moore; and (d) retaliatory mistreatment of her staff, including a senior citizen staff member whom Plaintiff defended. Despite directives from OECR leadership to suppress complaints, Plaintiff consistently instructed staff to document irregularities, demonstrating her commitment to accountability.

22. **January 31, 2024 – First Termination**. In direct retaliation for Plaintiff's disclosures, communications, and resistance to improper directives, Defendant Moore abruptly terminated Plaintiff without legitimate cause or due process, claiming to have done so at the direction of the Mayor. In relation to the existence of any basis for Plaintiff's firing, the termination letter signed by Defendant Moore merely stated as follows: "A probationary period for the City of Baltimore constitutes the six-month (6) segment of time during which an employee's competency to fulfill the duties of the position to which s/he is appointed is determined by the employee's supervisor. A probationary employee may be removed by the appointing officer at any time during this period. It is on this basis that your employment is terminated." In other words, no particular substantive reason was specified

for the termination, which makes sense given that, in reality, there wasn't one. As detailed further below, Defendant Moore would immediately thereafter spread falsehoods about Plaintiff. *See infra* ¶ 24.

23. **February 4, 2024**. On this date, Defendant Moore informed the members of the PAB, at their previously-scheduled meeting, that Plaintiff had been terminated. According to the publicly available minutes associated with this meeting, this triggered a separate "emergency meeting" with some of the PAB members regarding Plaintiff.

24. **February 27, 2024 – Plaintiff's Reinstatement Request and Disability Disclosure**. Nearly one month after Plaintiff's unjust termination, she submitted a written reinstatement request to City leadership, including Mayor Scott, Chief Administrative Officer Faith Leach, Council President Nick Mosby, and PAB Chair Harris, with a requested response deadline of March 1, 2024. In that communication, which spanned three-plus, single-spaced pages, Plaintiff explicitly disclosed her status as a cancer survivor and explained that her unlawful termination had disrupted her access to preventative medical care and insurance coverage, both of which she desperately needed. These disclosures constituted protected activity under the Americans with Disabilities Act ("ADA"), Rehabilitation Act, and Maryland's Fair Employment Practices Act. In addition, amongst many other things, Plaintiff informed the addressees of her letter of the following: "I am deeply concerned about the systemic issues within the Office of Equity and Civil Rights, affecting not only myself but also my team and staff members who are being harmed and impacted by the toxic leadership. Director Moore's abrupt and irrational decision to terminate me within 30 minutes on a day she was upset and making baseless accusations is unacceptable and unjust, and is the direct opposite action of equity and civil rights. …. Her actions were … retaliatory. It goes against the very principles of equity and civil rights that I have dedicated my life to upholding. …. Since my termination, Director Moore has called around, giving false accusations and a narrative around my termination, taking advantage of her inaccurate belief that no one else would come forward and speak up to tell the truth, thinking people will not support or show up for me or themselves, taking advantage of me only being here for only 2 1/2 months, but so many have chosen to stand up with me and support me through this painful process. …. I am nearly at a month without pay and out of time. I seek reinstatement …."

25. **March 1, 2024 – Limited Reinstatement**. In response, Plaintiff was reinstated retroactive to February 1, 2024, with back pay. However, Defendants refused to restore her to her rightful Chief role. Instead, Plaintiff was relegated to involuntary paid administrative leave, effectively sidelining her without responsibilities, authority, or the opportunity to return to the work she had been hired to perform. Significantly, this employment status would continue until her second termination four months later on June 28, 2024. As such, from January 31, 2024 through her firing on June 28, 2024, Plaintiff had no official assigned duties, as the City had given her none. She had no official job title, either. Specifically, in his March 1, 2024 email to Plaintiff "reinstating" her, the Director of the Department of Human Resources, Quinton Herbert, who also copied multiple members of the Mayor's office on his email, informed Plaintiff that she "would be on administrative leave with pay to allow my office to identify positions in other city agencies for you to transition to." Mr.

Herbert also offered to give Plaintiff a list of opportunities for her consideration, though no specific list was ever actually provided. Despite her repeated requests thereafter to be put back into her position as Chief or Acting Chief,[4] as well as the requests of others on her behalf, *see, e.g., infra* ¶¶ 27, 29, 33, Plaintiff was not placed into that position, or even the Deputy Chief position, ever again. This remained the case even after the removal of Defendant Moore from her position with the OECR, as detailed below. *See infra* ¶ 26. As such, it is obvious that the reason she was never put back into her prior position was due to the protected activity she had engaged in, both before and after her first termination, as recounted throughout this Amended Complaint.

26. **Spring 2024 – Independent Investigation**. An independent investigation commissioned by City leadership produced a 50-page report substantiating Plaintiff's allegations of misconduct. The report recommended Plaintiff's reinstatement to her position and concluded that Defendants Moore and her Chief of Staff had engaged in serious misconduct warranting removal. Both officials were subsequently removed from their then-current positions, in or about late April 2024. The independent investigator remains available to testify, further confirming the credibility of Plaintiff's disclosures and her vindication. Despite the recommendation concerning Plaintiff's reinstatement to her former Chief (or even Acting Chief) position, it would ultimately never occur.

27. **April 15, 2024 – PAB Emergency Meeting**. The Police Accountability Board convened an emergency meeting on April 15, 2024 and submitted a formal letter, through its Chair, Joshua Harris, on April 16, 2024 to the Mayor and others in his office requesting structural reforms and explicitly demanding Plaintiff's reinstatement as Chief. In the letter, the PAB stated, with regard to Plaintiff, in particular, the following: "We formally request the reinstatement of Aeiramique Glass as the Chief of the Police Accountability Division. It is our understanding that her termination was wrongful and without just cause. Aeiramique Glass is eminently qualified for this position, which she had initially accepted and relocated over 2,800 miles to fulfill. Her expertise and leadership are vital for the continued effectiveness and integrity of the PAD. We urge that she be allowed to resume her duties immediately to carry on with the critical work she began." Despite this official request, the City refused to return Plaintiff to her position. Indeed, when Mayor Scott eventually responded to this letter, doing so in his own letter on or about May 7, 2024 (which was six days after Plaintiff's email to his office requesting, again, reinstatement into her former position, *see supra* Footnote 4), he completely ignored the Board's request concerning Plaintiff, making nary a mention of it.

---

[4] Plaintiff personally made such requests by email on or about March 4, 2024 to Mr. Herbert and the Mayor's office, by email on May 1, 2024 to a representative of the Mayor's office in which she stated, amongst other things, "How is it that I did nothing wrong and yet I am not being allowed to return to my role?", in a Zoom meeting with Mr. Herbert on May 9, 2024, by emails on May 10, 2024 to the Mayor and Mr. Herbert, which will be detailed further below, *see infra* ¶ 30, and by email to Mr. Herbert and a representative of the Mayor's office on May 15, 2024. It should also be noted that, throughout this time, Plaintiff remained engaged in the world of police accountability, to the extent she could. For instance, she attended the monthly meeting of the PAB on May 6, 2024 in her personal capacity and, according to the meeting minutes publicly available online, engaged in some back-and-forth discussion with PAB members concerning a subject of common interest. She also organized and participated in a press conference with the PAB, as will be detailed further below. *See infra* ¶ 31.

28. **May 8, 2024 – Transfer Arrangement**. The Director of the Department of Human Resources, the aforementioned Mr. Herbert, sent Plaintiff an email describing a proposed "transfer arrangement," including a title, office space, and return-to-work date. Despite these assurances, Plaintiff remained on indefinite administrative leave and was denied restoration to her Chief role or, ultimately, to any role, underscoring the retaliatory nature of Defendants' conduct.

29. **May 9, 2024**. On this date, Ms. Mishou, on behalf of the entire PAD staff, wrote an email to the Mayor, with a copy to Mr. Herbert, requesting Plaintiff's reinstatement as Chief following her "wrongful termination," as Ms. Mishou herself termed it. In this email, Ms. Mishou made note of the fact that, by this time, Ms. Moore had been removed from her position with OECR, meaning she and Plaintiff would no longer be working together were Plaintiff to be returned to her former role.[5]

30. **May 10, 2024**. On this date, as noted above, *see supra* Footnote 4, Plaintiff sent an email to the Mayor and Mr. Herbert in which she stated, in part, the following:

> I am writing to formally request the immediate reinstatement of my duties as Chief of Police Accountability within the Office of Equity and Civil Rights (OECR). While I appreciate the initial steps taken to address the issues surrounding my wrongful termination by reinstating me and putting me on paid administrative leave, it is imperative that full restoration be achieved by allowing me to resume my role. I am ready and willing to return as soon as Monday, May 13th. I regret that I have been given this timing to express and address these issues, especially considering the ongoing election and the busy schedules you all maintain. However, I feel it's essential to emphasize that this matter has been lingering since February, and the recent offer of a position other than the one I moved across the country for lacks explanation, particularly given my wrongful termination while performing my duties extremely well.
>
> ….
>
> The Police Accountability Board, the Administrative Charging Committee, Civilian Review Board, and The Police Accountability Division have all made it extremely clear they want me back leading this work, which is an honor and shows the great impact I made in such a short amount of time and also show their dedication and their commitment to simply doing what's right.
>
> ….
>
> Despite the progress made in removing Director Moore from her position, the failure to immediately allow me back into my role following her departure is a glaring oversight or potentially intentional. Though I will refrain from making assumptions. My expertise and dedication to the field of police accountability are well-documented, and I have demonstrated my

[5] This particular email came after a March 11, 2024 email from Ms. Mishou to Mr. Herbert and others in City government, written on her own behalf, in which, among other things, she referred to Plaintiff's being "abruptly and wrongfully terminated."

> ability to excel even in the face of adversity. Denying me the opportunity to return to my role undermines the principles of accountability, transparency, and equity that are fundamental to our mission.
>
> ….
>
> Thank you for your attention to these concerns, and I eagerly await your response. The continued delay only serves to prolong the harm inflicted and undermines the trust and confidence of both the community and the dedicated individuals who serve alongside me in the pursuit of Justice and Accountability.

31. **May 13, 2024 – Press Conference and Media Corroboration**. On or about May 13, 2024, Plaintiff assembled with members of the PAB for a press conference in front of City Hall. Though she did not speak at the mic herself, she had personally organized the press conference, personally drafted a number of the speeches given that day, could be seen in person and on local television, *see. e.g.,* https://www.youtube.com/watch?v=PStiNAo-jA4, not to mention on the internet, attending the conference in support. She could also be seen by City administrators appearing on site at the conference and then speaking with the press thereafter. Representatives of the OECR, staff in the Mayor's Office, and likely the Mayor himself were aware of Plaintiff's involvement in the organization of this press conference and the fact that she attended. The subjects discussed at the conference were consistent with those expressed by Plaintiff previously (i.e., the assertions that resulted in her termination). The *Baltimore Sun* then published an article which, among other things, confirmed discrepancies in PAD staffing and corroborated Plaintiff's concerns regarding the diversion of monies for taxpayer-funded positions. This independent media coverage validated Plaintiff's prior reports and further demonstrated the accuracy of her disclosures. It also brought a new and more public light to these issues, just one day before the democratic primary election in Baltimore for Mayor.[6]

32. **May 14, 2024 – Primary Election Day**. On this date, Plaintiff was observed by the Mayor's staff working the polls with PAB Chair Harris and, significantly, speaking with the Mayor's opponent, former Mayor Sheila A. Dixon.[7]

33. **June 7, 2024 – Resignation in Protest**. Effective June 7, 2024, Ms. Mishou, the Acting Deputy Chief of PAD, resigned in protest, issuing a formal resignation letter that both called for Plaintiff's reinstatement and documented the toxic culture fostered by

---

[6] In response to the press conference, as expressed in this article, the Mayor's office issued a statement pushing back on some of the assertions at the conference by stressing the limitations on the power of the PAB to chart its own, independent course. Clearly, there was tension between the PAB and the Mayor. Yet, the Mayor was limited in his ability to *sua sponte* remove PAB/ACC members, for which cause was required. *See supra* ¶ 16. The Mayor could, however, get rid of Plaintiff with relative ease (albeit in violation of the laws set forth in Plaintiff's causes of action below).

[7] With regard to this occurrence, it is important to highlight that the City's Administrative Manual, which contains official city policies that govern city employees, states that "The City … encourages employees to exercise their right to participate in or refrain from engaging in political processes, including the ability to express any political opinion, without fear of penalty or reprisal." Balt. City Admin. Manual § 200-8. Similarly, the Local Government Article of the Maryland Code provides, in pertinent part, that "an employee of a governmental entity: … may freely participate in any political activity and express any political opinion[.]" Md. Code Ann., Local Gov't § 1-303.

OECR leadership. This public resignation further confirmed the legitimacy of Plaintiff's concerns and the retaliatory environment. In her email to staff concerning her resignation, Ms. Mishou stated, in part, as follows:

> The refusal to reinstate [Ms. Glass] communicates to the staff that the needs of the division and its important accountability work are second to politics. I recognize a certain amount of political interference is unavoidable, but this situation is far beyond what can or should be tolerated. In her continued absence, there is a lingering sense of vulnerability and uncertainty in the future of the PAD and the work it is meant to uphold.
>
> I feel terrible about leaving my colleagues in this vulnerable position. My departure places additional pressure on them, and they are already over capacity. However, I must do what is right for me. This is why I am compelled to take this last opportunity to plead for the immediate reinstatement of Aeiramique Glass, for the sake of the staff, their work, our sense of justice, and my peace of mind.

34. **June 26, 2024**. On this date, Mr. Herbert scheduled a meeting with Plaintiff for June 28, 2024. He provided no information concerning the subject matter of the meeting, hindering Plaintiff's ability to prepare therefor.

35. **June 28, 2024 – Second Termination**. Plaintiff was summoned to a meeting, scheduled two days earlier, at which her legal counsel was expressly barred from attending. At this meeting -- which occurred more than six months into her employment by the City and, hence, beyond the conclusion of her probationary period -- Plaintiff was terminated for a second time. There was no substantive reasons given for the termination which Mr. Herbert said was permissible because Plaintiff was purportedly "at-will," despite the findings of the independent investigation, repeated calls from staff and board members for her reinstatement, and prior assurances of a transfer arrangement. The termination letter likewise just referenced the dynamic of at will employment with no substance. This same pattern was followed, by the way, with other City personnel fired on this same date, including Margo Settles, who has her own suit pending before this Court against the City arising out of her wrongful termination. Plaintiff's second termination occurred almost immediately following the mayoral primary election, suggesting that Defendants' actions were motivated not only by retaliation for Plaintiff's protected activity in the recent weeks and months, which occurred as recently as the month prior, but also by political considerations by the Mayor designed to silence and sideline Plaintiff.

36. It is important to highlight that, when Plaintiff was speaking out and assembling with others who were speaking out (but who, unlike Plaintiff, could not be easily fired by the Mayor) in the weeks and months prior to her second firing, she had no official duties for the City as part of her ongoing salaried W-2 employment. This dynamic had the effect of increasing her constitutional protections to speak freely and assemble regarding matters of public concern -- which the City's misuse of taxpayer funds, strong-arming folks to go along with

improper actions before the ACC, and the accountability of the City's police force more broadly -- undoubtedly are.

37. The protections afforded by the First Amendment and Article 40 of the Maryland Declaration of Rights necessitate that "a government employer, generally, may not fire or demote an employee based on the employee's exercise of her or his First Amendment freedoms." *Newell v. Runnels*, 407 Md. 478, 608-09 (2009).

38. **Summary of Retaliation and Discrimination**. Plaintiff's consistent efforts to expose and speak about misconduct, her refusal to compromise her professional integrity, and her disclosure of her status as a cancer survivor requiring ongoing preventative care provide direct evidence of retaliation and unlawful discrimination under various laws. The sequence of events—initial termination, reinstatement without restoration, prolonged administrative leave, and final termination immediately following the mayoral election—demonstrates a clear and escalating pattern of reprisal that violated said laws.

39. Following her second termination, in addition to the noneconomic damages she suffered, as will be recounted in greater detail below, Plaintiff also suffered considerable wage loss due to her inability to secure replacement employment for an extended period of time.

## CAUSES OF ACTION[8]

### Count I – Disability Discrimination and Retaliation (ADA, 42 U.S.C. § 12101 et seq.)

Plaintiff incorporates by reference all prior paragraphs.

40. The ADA prohibits discrimination against a qualified individual on the basis of disability and retaliation against any individual who asserts their rights. See 42 U.S.C. §§ 12112(a), 12203(a).

41. Plaintiff is a survivor of cancer, which constitutes a disability within the scope and meaning of 42 U.S.C. § 12102(1) and the ADA Amendments Act of 2008, because cancer, even in remission, is recognized as a condition substantially limiting major life activities. *See* 29 CFR §§ 1630.2(j)(1)(vii), 1630.2(j)(3)(iii), 1630.2(k).

42. On February 27, 2024, Plaintiff explicitly disclosed her cancer-survivor status in a written reinstatement request, noting the disruption of her preventative care. This notified Defendants of her status as a disabled worker and also constituted protected oppositional activity under the ADA.

[8] The causes of action set forth below are based upon the facts recounted above and are being presented herein in accordance with the Federal Rules of Civil Procedure, including but not limited to Fed. R. Civ. P. 8(d), which provides, in pertinent part, that "[a] party may set out 2 or more statements of a claim … alternatively or hypothetically, either in a single count … or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient. …. A party may state as many separate claims … as it has, regardless of consistency."

43. Defendants, in response thereto, interfered with Plaintiff's medical coverage by causing an unnecessary delay in her ability to make use of same upon her reinstatement on paid administrative leave, precluded her from returning to her role as Chief or even Deputy Chief of PAD and instead saddling her with the aforementioned administrative leave designation, and, ultimately, terminated her as a result of, and in retaliation for, her disability disclosure.

44. The close temporal proximity of these events supports the contention that the disclosure caused the retaliatory adverse actions as all of these events occurred in a matter of days or a handful of months. Further support for the causal connectivity of these events, with respect to the June 28, 2024 termination in particular, comes from the fact that no substantive reason was given to her for the termination -- because there wasn't one.

45. These actions were willful and malicious, causing Plaintiff significant damages, including lost wages, emotional distress, and disruption of vital healthcare. Plaintiff seeks back pay, compensatory and punitive damages, front pay, and injunctive relief under the ADA.

**Count II – Disability Discrimination and Retaliation (§ 504 of Rehabilitation Act)**

Plaintiff incorporates by reference all prior paragraphs.

46. The Rehabilitation Act prohibits discrimination against a qualified individual on the basis of disability and retaliation against any individual who asserts their rights.

47. Plaintiff is a survivor of cancer, which constitutes a disability within the scope and meaning of the Rehabilitation Act because cancer, even in remission, is recognized as a condition substantially limiting major life activities. *See* 29 CFR §§ 1630.2(j)(1)(vii), 1630.2(j)(3)(iii), 1630.2(k).

48. On February 27, 2024, Plaintiff explicitly disclosed her cancer-survivor status in a written reinstatement request, noting the disruption of her preventative care. This notified Defendants of her status and a disabled worker and also constituted protected oppositional activity under the Rehabilitation Act.

49. Defendants, in response thereto, interfered with Plaintiff's medical coverage by causing an unnecessary delay in her ability to make use of same upon her reinstatement on paid administrative leave, excluded her returning to her role as Chief or even Deputy Chief of PAD and instead saddling her with the aforementioned administrative leave designation, and, ultimately, terminated her as a result of, and in retaliation for, her disability disclosure.

50. The close temporal proximity of these events supports the contention that the disclosure caused the retaliatory adverse actions as all of these events occurred in a matter of days or a handful of months. Further support for the causal connectivity of these events, with respect to the June 28, 2024 termination in particular, comes from the fact that no substantive reason was given to her for the termination -- because there wasn't one.

51. These actions were willful and malicious, causing Plaintiff significant damages, including lost wages. Plaintiff seeks backpay, compensatory and punitive damages, front pay, and injunctive relief under the Rehabilitation Act.

**Count III – Disability Discrimination and Retaliation (Maryland's Fair Employment Practices Act)**

Plaintiff incorporates by reference all prior paragraphs.

52. Maryland's Fair Employment Practices Act ("MFEPA") prohibits discrimination against a qualified individual on the basis of disability and retaliation against any individual who asserts their rights.

53. Plaintiff is a survivor of cancer, which constitutes a disability within the scope and meaning of the MFEPA.

54. On February 27, 2024, Plaintiff explicitly disclosed her cancer-survivor status in a written reinstatement request, noting the disruption of her preventative care. This notified Defendants of her status and a disabled worker and also constituted protected oppositional activity under the MFEPA.

55. Defendants, in response thereto, interfered with Plaintiff's medical coverage by causing an unnecessary delay in her ability to make use of same upon her reinstatement on paid administrative leave, excluded her returning to her role as Chief or even Deputy Chief of PAD and instead saddling her with the aforementioned administrative leave designation, and, ultimately, terminated her as a result of, and in retaliation for, her disability disclosure.

56. The close temporal proximity of these events supports the contention that the disclosure caused the retaliatory adverse actions as all of these events occurred in a matter of days or a handful of months. Further support for the causal connectivity of these events, with respect to the June 28, 2024 termination in particular, comes from the fact that no substantive reason was given to her for the termination -- because there wasn't one.

57. These actions were willful and malicious, causing Plaintiff significant damages, including lost wages. Plaintiff seeks backpay, compensatory and punitive damages, front pay, and injunctive relief under the MFEPA.

**Count IV – First Amendment Retaliation (42 U.S.C. § 1983)**

Plaintiff incorporates by reference all prior paragraphs.

58. It is clearly established law that the First Amendment protects public employees from retaliation for assembling and/or speaking as citizens on matters of public concern. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

59. Plaintiff's reports and assertions to persons inside and outside City government both before and after her first termination (including when she was on involuntary administrative leave with pay as a City Employee from March 1, 2024 through to her second firing on June 28, 2024) regarding independent counsel, ACC charges, and budget diversion all involved matters of substantial public concern, implicating government integrity, police accountability, and proper use of public funds.

60. Defendants, acting under color of state law and within the scope of their employment, retaliated against Plaintiff by terminating her employment, refusing to restore her to her position, isolating her on administrative leave during which time she remained employed but had no assigned duties, and ultimately firing her again post-election.

61. There was a causal nexus between Plaintiff's protected conduct and Defendants' retaliatory actions demonstrated by, among other things, the close temporal proximity between such conduct by Plaintiff and such retaliations by Defendants. In relation to her two terminations, in particular, further support for the causal connectivity of these events come from the fact that no substantive reasons were given to her for the firings.

62. Defendants' actions would deter a reasonable employee from engaging in such protected speech and assembly, and were motivated substantially by Plaintiff's protected disclosures.

63. In mistreating Plaintiff and, in particular, terminating her employment – twice – for exercising her constitutionally protected rights, Defendants acted with reckless indifference to Plaintiff's rights, or, in the alternative, acted with evil motive and/or intent.

64. Plaintiff seeks declaratory relief, back pay, front pay, compensatory damages, and punitive damages against Defendants, as detailed further below.

## **Count V – Retaliation under Article 40 of the Maryland Declaration of Rights**

Plaintiff incorporates by reference all prior paragraphs.

65. Article 40 of the Maryland Declaration of Rights protects public employees from retaliation for assembling and/or speaking as citizens on matters of public concern.

66. Plaintiff's reports and assertions to persons inside and outside City government both before and after her first termination (including when she was on involuntary administrative leave with pay as a City Employee from March 1, 2024 through to her second firing on June 28, 2024) regarding independent counsel, ACC charges, and budget diversion all involved matters of substantial public concern, implicating government integrity, police accountability, and proper use of public funds.

67. Defendants, acting under color of state law and within the scope of their employment, retaliated against Plaintiff by terminating her employment, refusing to restore her to her position, isolating her on administrative leave during which time she remained employed but had no assigned duties, and ultimately firing her again post-election.

68. There was a causal nexus between Plaintiff's protected conduct and Defendants' retaliatory actions demonstrated by, among other things, the close temporal proximity between such conduct by Plaintiff and such retaliations by Defendants. In relation to her two terminations, in particular, further support for the causal connectivity of these events come from the fact that no substantive reasons were given to her for the firings.

69. Defendants' actions would deter a reasonable employee from engaging in such protected speech and assembly, and were motivated substantially by Plaintiff's protected disclosures.

70. In mistreating Plaintiff and, in particular, terminating her employment – twice – for exercising her constitutionally protected rights, Defendants acted with reckless indifference to Plaintiff's rights, or, in the alternative, acted with evil motive and/or intent.

71. Plaintiff seeks declaratory relief, back pay, front pay, compensatory damages, and punitive damages against Defendants, as detailed further below.

## **Count VI – Municipal Liability (Monell, 42 U.S.C. § 1983)**

Plaintiff incorporates by reference all prior paragraphs.

72. The unconstitutional actions described herein were not isolated incidents but were the direct result of official policies, customs, or decisions of final policymakers within the City of Baltimore.

73. Mayor Brandon Scott and OECR leadership all exercised final authority and ratified or condoned the retaliatory conduct.

74. Under the Baltimore City Charter, the Mayor had the power to remove at his pleasure all department heads, such as Defendant Moore and the Director of the HR Department, Quinton Herbert, each of whom informed Plaintiff that she had been terminated, once on January 31, 2024 (by Defendant Moore) and once again on June 28, 2024 (by Mr. Herbert), the Mayor had the power to direct those department heads to terminate an employee like Plaintiff. As such, as a functional matter, the Mayor had unconstrained authority to terminate Plaintiff.

75. The City failed to prevent or correct known misconduct and instead implemented or tolerated practices of retaliation and discrimination.

76. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City is directly liable for these constitutional violations.

## **Count VII – Action Under Md. Code Ann., Labor & Employ. §§ 3-304.1(a)(3) and 3-307(a)(2)**

77. Plaintiff incorporates by reference all prior paragraphs.

78. Under § 3-301 of the Labor and Employment Article of the Maryland Code, an employer is defined to include "a municipal government in the State" and "a person who acts directly or indirectly in the interest of another employer with an employee." Md. Code Ann., Labor & Employ, § 3-301(b).

79. Under § 3-304.1(a)(3) of said Article, "[a]n employer may not: … take any adverse employment action against an employee for: … inquiring about … another employee's wages [or] aiding … another employee's exercise of rights under this section." *Id*. at § 3-304.1(a)(3).

80. Under § 3-307(a)(2) of the Article, "[i]f an employer knew or reasonably should have known that the employer's action violates § 3-304.1 of this subtitle, an affected employee may bring an action against the employer for injunctive relief and to recover actual damages and an additional equal amount as liquidated damages." *Id*. at § 3-307(a)(2).

81. Plaintiff herein inquired of her employer, in communications with Defendant Moore, about an increase in pay for one worker, Ms. Mishou, and inquired about comp time for another worker, Mr. Wafford. She also made other inquiries about other workers' need for comp time or overtime in communicating with Defendant Moore.

82. Very soon thereafter -- and on the same day with regard to Plaintiff's inquiry about Mr. Wafford -- Plaintiff was terminated from her employment and thereafter mistreated, as recounted throughout this Amended Complaint.

83. The exceedingly close temporal proximity of these events indicates that they are causally related and that the termination was in retaliation for this protected activity. Further support for the causal connectivity of these events come from the fact that no substantive reason was even given to her for the termination.

84. While Plaintiff would later be reinstated, she was never returned to the position she held at the time of her firing on January 31, 2024 and was ultimately terminated again in June 2024 without any reasons being given or existing. As such, the initial firing triggered a chain of events which cost her financially thereafter.

85. Plaintiff seeks the recovery of her actual damages for Defendants' violation of this statute as well as an equal additional amount as liquidated damages, and all other and further damages or other relief that may be recoverable.

**<u>Count VIII – Wrongful Discharge</u>**

Plaintiff incorporates by reference all prior paragraphs.

86. Plaintiff engaged in conduct protected by the Local Government Article of the Maryland Code when she, by way of example and not limitation, worked the polls on May 14, 2024 for the primary election for Mayor with PAB Chair Harris and spoke with the Mayor Scott's

opponent in the race, former Mayor Sheila A. Dixon, and did so in the presence of Mayor Scott's staff.

87. Said Article provides, in pertinent part, that "an employee of a governmental entity: … may freely participate in any political activity and express any political opinion[.]" Md. Code Ann., Local Gov't § 1-303. *See also* Balt. City Admin. Manual § 200-8.

88. Plaintiff also engaged in conduct protected by the Labor & Employment Article when she inquired of her employer about the wages of fellow employees in an endeavor to secure said employees an increase in such wages.

89. Said Article provides, in pertinent part, that "[a]n employer may not: … take any adverse employment action against an employee for: … inquiring about … another employee's wages [or] aiding … another employee's exercise of rights under this section." Md. Code Ann., Labor & Employ, § 3-304.1(a)(3).

90. The pronouncements in each of these statutory provisions constitute clear mandates of public policy for which there is no statutory avenue of redress within said Articles or elsewhere.[9]

91. In direct retaliation for Plaintiff exercising these rights and privileges which involved a clear mandate of public policy, Defendants terminated Plaintiff, not once but twice, each time within very close temporal proximity to said exercise and each time without any expressed (or existing) legitimate reason.

92. Defendants' conduct thus violated Maryland's common law of wrongful discharge, entitling Plaintiff to damages and equitable relief under state law.

## **Count IX – Negligent Misrepresentation**

Plaintiff incorporates by reference all prior paragraphs.

93. During her recruitment and throughout her tenure, Defendants, owing a duty of care to Plaintiff as her would-be employer and then employer, negligently made false material promises and statements to Plaintiff, including (a) that relocation benefits were unavailable (when in fact they were), (b) that she would be permanently appointed as Chief after probation (when she wouldn't be), and (c) that she would be restored to her role following reinstatement and vindication by the independent investigation (which did not occur).

94. Defendants intended that their promises and statements would be relied and acted upon by Plaintiff given her need for the job that was being offered initially and her great desire to

---

[9] With regard to Md. Code Ann., Labor & Employ, § 3-301(b), in particular, Plaintiff is pleading in the alternative in the event that the Court finds that Count VI, *supra*, is not actionable for some reason. This would then allow for a wrongful discharge claim under Maryland common law using this statutory provision as a clear mandate of public policy. *See, e.g., Molesworth v. Brandon*, 341 Md. 621 (1996).

continue working in the Deputy Chief / Chief position, as expressed in her numerous writings to Defendants recounted herein.

95. Plaintiff, justifiably, relied on these false promises and statements to her significant detriment by taking the job without relocation benefits that were, in reality, available, and then remaining in the job in good faith, despite being on administrative leave rather than in the Deputy Chief or Chief position, based upon commitments by Defendants that would never come to fruition, thereby causing her to incur financial and personal costs and forego other opportunities. Long story short, Defendants strung her along for months, costing her the chance to seek more fulfilling and likely more prosperous employment elsewhere, and then summarily fired her without legitimate justification.

96. Plaintiff seeks damages proximately caused by Defendants' falsehoods, including relocation costs, lost wages, and other consequential damages.

## DAMAGES

97. As a direct, foreseeable, and proximate result of Defendants' unlawful discrimination, retaliation, and constitutional violations, Plaintiff has suffered and continues to suffer extensive economic, emotional, reputational, and health-related harm. Plaintiff seeks the following categories of relief:

98. Front Pay (Future Economic Losses): Reinstatement to her Chief role is impracticable given the hostility, retaliation, and political reprisal she has endured. Accordingly, Plaintiff seeks front pay in lieu of reinstatement to fairly compensate her for the loss of future earnings, benefits, pension contributions, and career advancement opportunities. Based on her salary, benefits, and anticipated tenure, Plaintiff estimates front pay damages at no less than $400,000 and as much as $600,000, covering an expected three to five years of lost career trajectory.

99. Back Pay (Past Economic Losses): Plaintiff seeks back pay for all wages, benefits, and other forms of compensation lost from her initial unlawful termination on January 31, 2024, through her reinstatement, and again from her final unlawful termination on June 28, 2024, continuing through trial. Back pay includes not only base salary but also health insurance, pension contributions, retirement benefits, and other emoluments of employment, together with prejudgment interest. The precise amount will be established at trial based on payroll, benefits, and tax records.

100. Statutory Compensatory and Punitive Damages: Plaintiff seeks the maximum statutory award of $300,000 under 42 U.S.C. § 1981a(b)(3), representing damages for emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life resulting from Defendants' discrimination and retaliation. Plaintiff also seeks punitive damages under the ADA and the other statutes cited herein, to the extent available, in order to punish and deter intentional or reckless disregard for protected rights.

101. Uncapped Constitutional Damages (§ 1983 – First and Fourteenth Amendments and Article 40 of the Maryland Declaration of Rights): For Defendants' retaliation in violation of these constitutional provisions, Plaintiff seeks uncapped compensatory damages in the range of $1,000,000 to $1,500,000. These damages encompass:

(a) Reputational Harm: Loss of professional standing in Baltimore's public sector and the broader accountability community.
(b) Career Harm: Foreclosure of advancement opportunities and diminished future employability in government service.
(c) Emotional Distress: Severe anxiety, depression, humiliation, and trauma from repeated terminations despite vindication by an independent investigation.
(d) Constitutional Deprivation: The chilling of Plaintiff's protected speech. Plaintiff further seeks punitive damages against the individual defendants, including the Mayor, for their willful, malicious, and reckless indifference to her rights.

102. Special and Consequential Damages (Relocation, Medical, and Ancillary Losses): Plaintiff uprooted her life and relocated from San Diego, California to Baltimore, Maryland, in reliance on the City's promises. She incurred significant relocation expenses, moving costs, housing expenses, and related financial burdens, conservatively valued at $50,000 or more. Further, because of her status as a cancer survivor, Defendants' actions caused disruptions in her preventative medical care and insurance coverage, placing her at increased health risk and forcing her to incur additional medical expenses. These health-related and financial consequences, together with statutory interest, are valued at $100,000 or more.

103. Attorneys' Fees and Litigation Costs: Plaintiff seeks recovery of attorneys' fees, expert witness fees, and all taxable litigation costs under the applicable law.

104. Equitable Relief and Injunction: Plaintiff seeks appropriate equitable relief, including (a) injunctive orders prohibiting further retaliation by the City of Baltimore; (b) structural reforms to ensure compliance with the ADA and constitutional obligations; and (c) public correction of the false narrative that stigmatized Plaintiff's reputation.

105. Aggregate Damages: Plaintiff's combined damages, including economic losses, statutory remedies, constitutional violations, special damages, punitive damages, and attorneys' fees, exceed $3,000,000. Plaintiff anchors her total claim at approximately $3,000,000, with precise amounts to be determined by the jury, subject to the statutory cap on ADA compensatory and punitive damages but inclusive of uncapped § 1983 and state law remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aeiramique Glass respectfully requests that this Court enter judgment in her favor and against all Defendants, jointly and severally, and grant the following relief to the fullest extent permitted by law:

a. **Declaratory Relief**. A declaration that Defendants' acts, omissions, policies, and practices violated Plaintiff's rights under:

- The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.;
- 42 U.S.C. § 1983, by depriving Plaintiff of her rights under the First and Fourteenth Amendments; and
- Maryland's common, statutory, and constitutional laws.

b. **Equitable Relief – Reinstatement in Lieu of Front Pay**. An award of front pay for a sufficient duration to make Plaintiff whole, including projected salary increases, pension accruals, and career progression.

c. **Back Pay and Benefits**. An award of back pay for all lost wages, benefits, retirement contributions, health insurance, and other employment emoluments from Plaintiff's unlawful termination(s) through the date of judgment, together with prejudgment interest to ensure complete economic restitution.

d. **Compensatory Damages**. An award of compensatory damages, to the maximum extent permitted by law, for:

- Economic losses, including relocation costs and medical expenses incurred due to Defendants' unlawful conduct;
- Emotional distress, including mental anguish, humiliation, loss of enjoyment of life, and trauma;
- Reputational harm, including loss of professional standing and diminished future employability; and
- Health impacts, including disruption of Plaintiff's preventative cancer care.

e. **Punitive Damages**. An award of punitive damages against the individual Defendants, including Mayor Scott, to punish their willful, malicious, and reckless indifference to Plaintiff's state and federally protected rights, and to deter similar unlawful conduct by public officials in the future.

f. **Injunctive and Structural Relief**. Entry of broad injunctive relief requiring the City of Baltimore and its agencies to:

- Cease and desist from further acts of retaliation or discrimination against Plaintiff or others;
- Implement reforms, policies, and oversight mechanisms ensuring compliance with the ADA, the First and Fourteenth Amendments, and Maryland law;
- Provide training and monitoring for City officials and managers concerning employee rights and whistleblower protections;

- Establish independent oversight within OECR and the Police Accountability Division to prevent recurrence of misconduct.

g. **Attorneys' Fees and Costs**. An award of Plaintiff's reasonable attorneys' fees, expert witness fees, litigation expenses, and costs of suit pursuant to 42 U.S.C. §§ 2000e-5(k), 12205, and 1988, and applicable Maryland law.

h. **Interest**. An award of both pre-judgment interest and post-judgment interest at the maximum legal rate to compensate Plaintiff fully for the time value of money wrongfully withheld.

i. **Additional Equitable Relief**. Such other equitable remedies as the Court deems just, including but not limited to:

- Expungement of Plaintiff's personnel record of any references to adverse actions;
- Restoration of retirement service credit and eligibility;
- Public correction of the record to clear Plaintiff's professional reputation.

j. **General Relief**. Such other and further relief, both legal and equitable, as this Court deems just, proper, and necessary to fully vindicate Plaintiff's rights, deter future violations, and serve the public interest in accountability, transparency, and protection of workers within government service who exercised their rights under the law and suffered for it.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**Respectfully submitted,**

/s/ Neil R. Lebowitz

Neil R. Lebowitz, Bar No. 25155
Lebowitz Law Firm
5850 Waterloo Road, Suite 140
Columbia, Maryland 21045
neil@lebowitzlegal.com
410-730-9010
Counsel for Plaintiff Aeiramique Glass